Good morning. My name is Rhonda Mayer. I represent the appellant, Mr. Nicholas Joseph. Mr. Joseph is now 26 years old. He is serving a 264-month or rather a 22-year sentence for the instant convictions. This court should reverse Mr. Joseph's convictions on counts 2, 3, and 5 because they're not supported by legally sufficient evidence. First, regarding counts 2 and 3, the evidence failed to demonstrate that the April 28, 2017 shooting in the vicinity of the Story Playground was committed for the purpose of increasing or maintaining Mr. Joseph's position in the Castle Hill Crew, a gang he was alleged to have been a part of. The government's theory was that the shooting on April 28 was in retaliation for shots that had been fired at Mr. Joseph by members of a rival gang, the Monroe Crew, one day earlier on April 27. However, the evidence introduced at trial failed to demonstrate this beyond a reasonable doubt. There were a number of reasons for this failure. First, there was no shot spotter evidence of a shot fired on April 27, 2017. Ironically, there was shot spotter evidence of the shot fired on April 28 the next day. And according to the witness who testified about shot spotter, it detects up to 90% of detectable outdoor gunfire within a coverage area. Second, the government presented no witnesses to establish that a Monroe Crew member, including Lateef Jenkins or Nassir Vincent, actually fired shots against Appellant the day before on April 27, 2017. If you take a look at the evidence, you see that there's only testimony by Angel Arroyo, who testifies that he witnesses Nassir Vincent and Willie, these are two members of his gang, the Monroe Crew, follow Appellant, Mr. Joseph, and somebody he was with named CJ, behind a building with a gun that they called Shaq. After Arroyo saw them go behind the building, he couldn't see anything else. But he claims he heard what sounded like a gunshot fired. Now, he couldn't testify which of the four men discharged the gun. We don't know if anybody else had a gun behind that building. And as I mentioned initially, there was no shot spotter evidence that a shot had been fired. So what Arroyo heard may not have even been a gunshot. Additionally, the victim's mother, Tricia Kroll, she was from the neighborhood. She knew everybody in the neighborhood. She ran a daycare center there. And she expressed no belief when she testified at trial that the shooting had been gang-related on the April 28 story playground, that her son Isaiah had been the one that was inadvertently shot. And she, Kroll, while it wasn't admitted for its truth, she testified she heard rumors that the shooting was related to Mr. Joseph's girlfriend or a girl he was involved with. And Mr. Joseph himself said this at his own sentencing. So in light of the government's failure to establish that the April 28 shooting was for the purpose of maintaining or increasing Mr. Joseph's position in the Castle Hill crew, our position is that this court should reverse its convictions on counts two and three and the resulting sentences. It's also our position that Mr. Joseph's conviction on count five was not established with legally sufficient evidence to prove that he had possessed a firearm. There was a firearm that was recovered on December 10th of 2020. And there was, as a result of a stipulation with regard to this count, the only remaining element in dispute was whether or not Mr. Joseph had possessed the firearm, either actually or constructively, on December 10th. There's no question he possessed it before that. Well, there was no proof he possessed it before that. There's a video of him with it, isn't there? But we don't know if that's the same gun. It was a nondescript- An unusual gun, not that I'm an expert. But apparently everyone thinks it's a peculiar kind of a gun, silver. Well, I think there were others. So I think there was testimony that there were some silver guns on the street, although it may not have been the most popular color. It's not the only silver gun in the world or the only silver gun on the streets in the Bronx being used by these gangs. And we don't know that it was the same gun that was used that day. And what we do know, though, is that the gun, both Detective Ruiz and Officer Walsh both agree that the gun was recovered from a ditch at a construction site. It wasn't recovered from a pellet. No one saw him throw the gun there, including Detective Ruiz. And there was some DNA analysis done that indicated it was possible that Malik James had touched this gun, not a pellet. The DNA evidence actually established that it was unlikely that the same firearm had been touched by Mr. Joseph. And additionally, this firearm was recovered from a section in the construction site where the law enforcement had been chasing Malik James. So we have them chasing Malik James. They find the gun in the vicinity of where they're chasing him. And according to DNA evidence, it's possible that he had touched this gun. And according to DNA evidence, it's unlikely that Mr. Joseph had touched this gun. And the only thing we have to hang our hat on is a video of a similar gun, which to put Mr. Joseph, who was 22 years old away at the time, for an additional 10 years is outrageous, I have to say. You know, he already would have a sentence of 144 months without this conviction. And I'm not saying it should be vacated for that reason, but it should be vacated because there wasn't sufficient evidence. And the net result is you've got a 26-year-old man now in jail for an extra 10 years. Additionally, I just want to touch upon, I don't have much time here, the remaining two points in the brief. And the one that I want to touch upon first would be the court's refusal to voir dire on implicit or unconscious bias. The fact he may have said something or did say something to the jury after the case was over did not remedy the fact that there may very well have been jurors who were trying this case who were unconsciously or implicitly biased. He did also ask about prejudice generally during voir dire, right? And then gave a specific instruction to the effect of what you're asking for now. He gave it afterwards. But, Your Honor, I'm a professor as well as an attorney. And I can say that, and I have another job as well where I'm a village court judge, I have to have implicit bias training with respect to everything. I have to be made aware of the fact, and I'm an educated person, that I may have unconscious biases that will impact the way I deal with my students when I'm teaching, or the way I deal with litigants who are in front of me. But there's a difference between telling jurors that they should not succumb to bias and telling them, which they were told, and telling them about implicit bias, which basically means something that you have but you don't know you've got it. Because then you're telling jurors to make decisions on the basis of stuff that they do not apprehend or understand. Well, I don't, Your Honor, I respectfully disagree. Implicit bias, understanding that you have it, makes you aware of the fact that you may be finding somebody guilty because you don't like the fact they came from the projects. That you may be finding them, you may think you're the most liberal person in the world, but you may be finding them guilty because they're part of a gang. You may be finding them guilty because of the people they associate with. When we're aware of our potential to be discriminating, it should, in effect, give us second thoughts before we make decisions that could potentially be discriminatory. And implicit bias is more dangerous than express bias in these situations because most of us like to believe we're not prejudiced. Thank you, Ms. Mayer. You've been preserved a couple minutes for a vote. Thank you. We'll hear from the government. Good morning, and may it please the court. My name is Andrew Chan, and I represent the United States in this appeal, as I did in the district court proceedings before Judge Castell. I'd like to start off by going back to the questions from the court regarding Judge Castell's voir dire in this case. At the outset, the court should be applying the plain error review standard here because the record is quite clear that the defendant did not object to Judge Castell's voir dire process in this case. He did not object during the voir dire process, and when he was asked on multiple occasions at the end of the voir dire process whether he was satisfied with the jury, the defendant responded that he was, in fact, satisfied with the jury. There are cases in which a judge is required, or certainly encouraged, during voir dire to take up issues of bias, particularly race bias. I think that is correct, Judge, and what I would say to that is that Judge Castell acted well within his discretion in trying to address the possibilities for bias in this case. As we noted in our brief, the record during the voir dire process indicates that there were multiple occasions in which Judge Castell included questions and instructions about the importance of jurors being both unbiased and fair and impartial. During the voir dire process... Was there a racial component to this case? There was not, and that is one of the factors that this court has observed, is the question of whether or not there's actually a possibility that the charges in this case or the trial itself was infected with a problem of racial bias. And there was no evidence in this case in the record that there was anything racially motivated about the charges or that race played a role in the case at all. In defense counsel's brief, they highlighted the fact that there was a member of the gang that was identified during the course of the trial who was sitting in the back of the courtroom and there were concerns by the jury after they completed their deliberations about safety. Those are all explainable by the fact that the charges involved violence. And the evidence showed that there were members of the gang in the courtroom that committed acts of violence in the case that were sitting in the courtroom during the proceedings. And so it's very understandable that the jury would have been concerned for their own safety after their deliberations in this case. Would you turn to Mr. Joseph's possession or constructive possession? Your adversary points out that there's a ten-year mandatory sentence here based on his possession of a gun that does not have his DNA and that a lot of people might have. Yeah, just to correct one point, Judge Jacobs, there was actually no mandatory minimum sentence for that particular gun. But it's an additional ten years. That is correct, that Judge Castell imposed the sentence. On that point, the indictment in the case charged that the defendant had been in possession of that gun from November 2020 through December of 2020. And there was ample evidence in the record for the jury to conclude that at some point during that period the defendant was in possession of that gun. That gun? Of that particular gun. That gun or a silver gun of a certain make? Well, of that particular gun. And I think to the question... That very gun? Yes, of that particular gun. And Judge Jacobs... Your adversary points out that there are silver guns. It may be ostentatious and bad taste, but there are such things. Yeah, and to your point, Judge Jacobs, there was testimony at the trial from the officer who seized that gun who indicated that during his career he had recovered a hundred guns and this was the only gun that he had recovered that was as distinctive as this one. A silver chrome firearm with a white handle with a screw in the middle of the handle. And there were numerous photographs and videos on the defendant's own cell phone that he possessed. Does the video show the screw on the handle? It does. It does show all of those distinctive assets. And the jury was entitled to find that the same firearm that they are seeing the defendant brandish in these videos and photographs from November and December of 2020 was the same firearm that was recovered on that night. I would also note that in Government Exhibit 517, the defendant was exchanging text messages with another person. These were all found on the defendant's cell phone. We don't know for sure who that other person is. The record doesn't indicate that. But on page 10 of that Government Exhibit, the defendant was asked by that person, you got pull yourself. This, again, is on the night of his arrest. Pull being a gun. Pull being a gun based on testimony by cooperating witnesses. And in response to that question, just hours before he was going to be arrested, the question was asked, you got pull yourself. The defendant responded, yeah, gang. I think the jury was entitled, based on all these inferences and the exceedingly deferential standard of review that applies here, to find that this very distinctive firearm that the officer had only recovered once in his entire career involving a hundred different gun recoveries, the jury was entitled to find that that firearm that was recovered was the firearm that the defendant was seen brandishing in his cell phone in those videos and photographs. I also want to go back briefly to the point about the sufficiency of the evidence on the gang-related motive for the shooting. Again, applying the exceedingly deferential standard of review that applies here. Does it have to be in retaliation for the events of the day before or specific to Vincent or just gang-related? It does not have to be in retaliation for the events before. The statute merely requires that the motive for the shooting, at least in part, be for the defendant to increase or maintain his status in the Castle Hill crew. And there was, again, ample evidence of that gang-related motive in the record. There were two different cooperating witnesses, Angel Arroyo, who was a member of the Monroe Houses crew, and Christopher Cruz, who was a member of the Castle Hill crew, who both testified about this longstanding and back-and-forth conflict between the Monroe Houses crew and the Castle Hill crew. And they explained how committing acts of violence against rival gang members was a way to gain power and respect within the gang. Putting in work. Yes, exactly. Putting in work for the gang. And Christopher Cruz further testified that the defendant's status within the Castle Hill crew, it in fact increased, it actually increased as a result of the shooting. Christopher Cruz testified that the defendant, quote, had more status than most of the other people in this gang as a result of the shooting. Additionally, social media evidence and text messages further corroborated how the defendant... So the point is, whoever he shot, that would have increased his status. That's right. That's right. It actually increased his status within the gang. And I would point out that the location of the shooting is... So it really doesn't matter whether, according to you, it doesn't really matter whether he did it to increase or maintain his status in the crew. If he just did a thing horrible enough, it would increase his status. That's not quite right. I think the question has to do with the defendant's intent and the inferences based on the evidence in the record that can be drawn about the defendant's intent. And I think the jury was entitled to certainly find that, given that the defendant's status in fact increased, and given the long-standing back-and-forth conflict in which members of this gang are committing acts of violence for the purpose of increasing their status in the gang, and given the social media evidence and the text messages in which the defendant said, quote, I'm beefing with the whole Monroe. I started it. And in a rap video where he says, I spin on Monroe, I think based on that record the jury has ample evidence to conclude that at least one of the purposes of this shooting was to increase or maintain the defendant's status in this crew. I would also note that this court's recent decision in white is almost exactly directly on point here. In that case, there was evidence of tension between two rival gangs at the time of the shooting, and the defendant had openly discussed his desire to commit acts of violence against these rival gang members. Those exact same facts are present here. There was the long-standing back-and-forth conflict that had been going on for years between the Monroe House's crew and the Castle Hill crew, and the defendant had rap videos and messages in which he was indicating his desire and interest in committing acts of violence against other members of that gang. Here, the inference is even stronger because there was evidence from a member of the Castle Hill crew who said, in fact, that the defendant's status increased as a result of the shooting, which in many ways makes this case even stronger than in white. Unless there are any other questions from the courts, we would respectfully request that the court affirm the judgment of conviction in this case. Thank you, Mr. Chen. We'll hear a rebuttal. Your Honor, we disagree that the testimony of Christopher Cruz provided ample evidence that Mr. Joseph committed this crime to increase his status in the gang, and I think that the evidence at trial supports our position. First of all, Christopher Cruz was much older than Mr. Joseph. Mr. Joseph at the time was 22 years old. Mr. Cruz was almost 10 years older than him. He testified he was part of an older group of the Castle Hill crew members and that Mr. Joseph was part of the younger group, who he called the 670 Corporation. When asked in court to identify Mr. Joseph, who's the defendant, he couldn't do that. He couldn't identify who he was. He didn't know where he lived. He didn't know much about him at all. That said, he had an incentive, like all cooperating witnesses do, which I'm not going to waste my time on, but he had incentive to say what he needed to say to help the government. And he was a liar, and so the fact he lied once isn't going to stop him from lying a second time. As far as Mr. From the perspective of Mr. Joseph, okay, Mr. Joseph was not shy about getting on social media and bragging about things, as the government pointed out, what he was going to do, who he was going to do it against. And, again, he's a 22-year-old kid living in the projects trying to make a name for himself, and he thinks he's a rapper. When he stabbed Arroyo, and there's evidence that before this shooting on the 27th and then the 28th, or the alleged shooting on the 27th and the shooting on the 28th, that there had been an incident between him and Arroyo, and he had stabbed Arroyo, and he didn't hesitate to brag about stabbing Arroyo. There's nothing, there's nowhere in the record is he bragging about shooting, the shooting on April 28th. But that doesn't mean he didn't gloat about it or brag about it. Well, he doesn't brag about it in any of his videos, he doesn't, but he's a bragger. We see he's a bragger, and he didn't hesitate to brag about stabbing Arroyo, yet he didn't say anything, he didn't take credit at all for this. He's also not in a leadership position. Who would take credit for shooting a 12-year-old playing basketball? He might, because I'm not going to comment on people's mentality, it's different. So maybe this was a perfectly fine thing for him to do, I don't know. He himself was only 22. He had people in his gang that were probably younger than him. And, again, this I spin on Monroe was just words in a rap video that I don't believe you could use as a basis to say that he then went and shot a kid in Story Playground because he wanted to elevate his position. There's no evidence that his position was elevated. What Christopher Cruz heard in a deli from a third party was nothing more than gossip. He didn't hear a pallant bragging about this himself. As far as Mr. Joseph's attorney not objecting to the voir dire, he doesn't object on the record, but he clearly found it objectionable. He asked the judge to give a specific charge. He went ahead and proposed the charge and handed it to the judge. The judge didn't do it, and then after the case was over, he filed a Rule 29 motion, and he raised the fact in his Rule 29 motion that there had been, that the court was committed error by not giving the implicit bias charge. But that wasn't a contemporaneous objection. No, I'm not disputing that, but I will say that he did make a ruckus about it. Thank you, counsel. Thank you both. We take the case under assessment.